Mr. Fortunato. Thank you, Your Honor. May it please the court, my name is Michael Fortunato and I represent the appellant Merrill Lynch Pierce, Fenner, and Smith, Incorporated. I'd like to reserve three minutes for rebuttal, Your Honor. Grants it. Thank you. It's deja vu all over again, Your Honor, so I start out by arguing, and welcome Judge Rundell to the party, but I start out by presuming that the court wishes for us to re-argue the entire matter, and that's what I'm prepared to do. And the reality is that I'll begin where I left off when we met in February, which was, through the words, absolutely no support at all in the record for underlying the arbitrator's determination mean anything anymore. In this particular case, Merrill Lynch's position is that Judge Schwab's decision to vacate the underlying arbitration award took us back to a time of judicial hostility to arbitration provisions. Judge Schwab simply, in this case, substituted his own judgment for that of the arbitrators in vacating the decision. He, in his opinion, put in all the correct standards, he said all the right things, he wrote all the right language, and he did exactly what he wasn't supposed to do under the teachings of this court and the teachings of the United States Supreme Court. And in doing so, he did not follow the language of no support at all in the record to justify the decision. He was not... Let me ask you this question. Once a determination was made that Ms. Schwarzwalder was disabled, wasn't she entitled to the balance of the transition compensation payments at that time, less any outstanding debts? Well, that all depends, Your Honor. It depends on who's making that determination. We took the position in the arbitration that it was up to that arbitration panel to make the determination as to whether she was disabled under the terms of the employment agreement. That's res judicata. I mean, they found, the arbitrators found she was disabled based upon the district judge's decision. Well, they found that after they also understood that there had been a settlement agreement. So recall that MetLife, as the third-party administrator, makes the determination that Ms. Schwarzwalder's not disabled under the terms of Merrill Lynch's plans. That case gets appealed to the Third Circuit. While that case is pending before the Third Circuit, that decision of Judge McVeary, the parties enter into a settlement agreement. In that settlement agreement, all issues are resolved except for what is expressly carved out in the release. One thing carved out in the release was Merrill Lynch's claim to recover on the promissory note, and then Ms. Schwarzwalder specifically carved out several claims under the employment agreement, but not the claim for monthly transition compensation benefits. She carved out two deferred comp claims. She carved out two claims for short-term contingent awards, and she carved out a civil conspiracy claim. So she specifically addressed the employment agreement and claimed that she believed she had under the employment agreement. Why wouldn't the transition compensation payments be available as a defense to the claim on the promissory note? Well, certainly that was Ms. Schwarzwalder's position, but Merrill Lynch's position was, and the position that the arbitrators understood was, well, wait a second. That's not – these are separate agreements. The promissory note is an unconditional promise to repay. The employment agreement is something separate. Yes, the payments – They matched up exactly. Well, only the payments matched up exactly. The documents didn't refer to each other. The documents – one didn't match the other. They were executed on different dates, as I recall. And, Your Honor, the reality is that Ms. Schwarzwalder could have paid off that promissory note and have been entitled to monthly transition compensation payments wholly separate and apart had she continued her employment at Merrill Lynch, remained in good standing. But, Judge VanAskey, there were several other issues that were pending at the time when the case was settled. The facts that the panel had in front of it was that in 2005, Ms. Schwarzwalder signed what was called an acceptance wavering consent, permanently barring herself from the industry. She was barred by the regulators pursuant from even before her long-term disability payments ended. She also had – and what was part of the record in the underlying arbitration – she had a website. And on her website, she said that she had retired from the business after the tech bubble burst in 2001. So we, Merrill Lynch, were prepared to ask this arbitration panel to make a determination unlike the ERISA claim. The ERISA claim, the Court will recall, involved two payments of – But you had the arbitration stayed pending the outcome of the ERISA case because it could have an effect on what she was entitled to. Right. That was Ms. Schwarzwalder's – that was Ms. Schwarzwalder's position in the stay. So, of course, if the Court – if the Court had agreed with MetLife and said that she was not disabled under – Am I wrong that Merrill Lynch asked to stay the FINRA arbitration? I believe it was a joint request pursuant to Ms. Schwarzwalder's argument, Your Honor. We have made it very clear, and I think it's in our briefing accurately, that we – Merrill that this may be determinative. If the Court were to make a determination, if Judge McVery had to decide that we agree with MetLife and the ERISA rules were followed and she was not disabled as a third-party administrator determined, then that issue would not even be present anywhere for the arbitrators. We would not have to litigate the issue separately, in our opinion, and have that arbitration panel, which was making a determination as to what that employment agreement meant, would have to make a determination as to whether she was disabled or not, potentially. Where does the settlement agreement, dated November 25, 2009, where does that fit in the timeline of the litigation, arbitration, et cetera? It fits in that the – it fits in just prior to the resumption of the arbitration pursuant to Ms. Schwarzwalder's second and then third amended complaint. She asked that it be reopened, correct? She asked that it be reopened. So she joins Merrill Lynch in 2002. She goes on short-term disability in October 2003. In May 2004, she applies for long-term disability benefits. We then also begin litigating our right, Merrill Lynch's right, to recover on the promissory note. At the same time, she's litigating the MetLife determination that she's not disabled. That gets resolved before this court has a moral argument in late 2009 pursuant to that settlement agreement, and then she reopens to finish the arbitration. But I think the point of the question Judge Manaske is, this arbitration panel said, okay, hold on. We are going to adopt Judge McVeary's decision that she was disabled. That's – and we're going to live by that. We know, Merrill Lynch, what your position is, that it's up to us to decide whether she's disabled or not. We disagree with you. We're going to find that she's disabled pursuant to that claim. But we're also going to find that her request for the monthly transition compensation payments were – is an affirmative claim that she should have brought. And in any event, had she brought it, we're going to find, based on the express language of the settlement agreement, or more importantly, the carve-out language of the settlement agreement, that it's been released. And therefore, she's not entitled to that money. So we're going to give you your money back on the promissory note. We're going to find in her favor on some of her comp claims. We're going to deny some of her compensation claims. And we're going to find that she either should have pled this and did not. And even if she had, it would have been released. And I think that by the time we get to the level of this Court, even under a De Novo review, the question simply is, is that so untethered from the facts, the documents, that an arbitration panel composed of two lawyers and one industry person could not have made the decision on their own that we've read the employment agreement, we've read the promissory note, we've read the settlement agreement and release, we heard three days' worth of testimony, we admitted 80 exhibits into evidence, we heard argument on a motion for summary judgment where motions for summary judgment aren't even appropriate under the FINRA code, but we heard it anyway. Did anyone from Merrill Lynch – and I think I know the answer to this – testify as to the intent of these two agreements as to whether they went together or not? I mean, the note and the transition. Was there any evidence about that other than her statements? I don't think that there was any testimony. I'll say, Judge Rendell, candidly, I don't recall if there was any testimony on that issue or not. It did come up as a – it was argued by Ms. Schwartzwalter in her motion for summary judgment in our opposition. So it came up as argument to the panel. Her claim – or her argument that, well, the monthly transition compensation payments, although we didn't assert it as a claim, are our defense because it's our defense to the Merrill Lynch's claim on the promissory note. And we took the position, well, wait a second, time out, that's not accurate. It's a claim that you should have brought and you did not. I don't think we then got into the weeds from anybody who was there at the time that the agreement was signed any talk about the intent. Because it does look like – I mean, the payments matching up against each other. It looks like they're supposed to cut each other off because it's a lot of money to pay on an ongoing basis under this note. And it's a very convenient form to have them all setting and no money changes hands. It looks like they're meant to go together, but I guess the question is, was there evidence? And I think that that's right, Judge Rendell. You can look at even the cases that Mr. Shiver cites, and he says, well, there's a long history of these notes being forgivable. Well, not this particular note. These notes are different. And even Judge Schwab said, well, I'm aware of the history of forgivable notes. And this does look a little different, but I'm going to treat it as if it was the same. I think the more interesting question, certainly the more applicable question to be raised right here is, what is the panel's – what is the court's role, either this court or the district court's role, in second-guessing what the arbitrators did? And even if you looked at it and said, well, you know, had I been sitting in that room, I might have asked for more evidence as to the party's intent. Had I been sitting in that room as an arbitrator, I may have asked more questions about whether this was legitimately a forgivable loan or not. But we know what the arbitrators did. The question for this court is, is there no justification at all in the record supporting that decision, or is it completely irrational? And when you measure that against – What causes me some trouble here is understanding the rationality of releasing the claim for $750,000. Well, it could be, Your Honor. It could have been Ms. Schwartzwalder's intent. And I don't know. I would be speculating. But it could have been her intent that she did not want to have a debate over – she did not want to have a debate or have this court decide the ERISA claim. She did not want to have a debate in the arbitration as to whether she was truly disabled or not. I know that Mr. Shivers will take the position that it's shameful that we continue to by a federal court is truly disabled. But that is not disabled, or that I would even have the gall to make such an argument. But the reality is that we were prepared to argue these issues, and maybe she had decided that, I will pursue my other compensation claims – the referral claim, the deferred compensation claim, the short-term contingency claim – I will pursue those claims and not the monthly transition compensation claim, until she files her motion for summary judgment and says, well, wait a second. This is just a defense to the promissory note. And we took a different position. And ultimately, it was up to the panel to make that determination as to whether our position was more logical, reasonable than her position under the fact that they understood them after reviewing all the exhibits. And so I think I just – I see that my time is expiring, so I'll end where I began, which was under the complete irrationality test, if you look at Judge Schwab's decision, was he being narrow in the extreme? Was he being deferential? Were the facts so untethered, or decisions so untethered from the facts in the underlying proceeding, that it's completely irrational? And under the terms of the Federal Arbitration Act – I mean, here we are, how many years past the conclusion of the arbitration and our second go in the Third Circuit after being in the district court. We're far afield at this point from the very basis of the Federal Arbitration Act, which is a quick, expedient way to resolve our industry disputes. So I've reserved time. I see that my time has expired. Thank you, Your Honors. Thank you. Good afternoon, Your Honor. Good afternoon. I'm Joe Shivers, and we have been here once before. Let me, if I could, first address a question you raised, Judge Rendell, which is, was there any testimony or evidence of any kind offered by Merrill Lynch on the question of what the intent of the parties was, and how was this original arrangement made back in 2002, which is when Ms. Schwartzwalter first went to work for Merrill? And the answer is, nothing. They never countered it. They never responded. The only testimonial evidence of any kind relative to the intent of the parties, how the arrangement was made, how the loan and the forgiveness of the loan were structured was in Ms. Schwartzwalter's affidavit, which she provides on the appendix 292.  And it really leads me to the main point that I wanted to make, that I tried to make the first time around. I'm not sure if I made it as clearly as I'd like to now, which is the fundamental problem, in my view, with what the panel did, it never dealt with a question. Excuse me. Which panel? The arbitration panel or our panel? Sorry. Arbitration panel. Yeah. Both. Both? Well, at any rate, but the arbitration panel. The fundamental problem, I believe, and consistent with not only Hall Street, but also with the Paul Green School of Rock Music case decided by the Third Circuit and also Armstrong County Memorial Hospital. In my view, the fundamental problem is that the FINRA panel never addressed the question of whether Ms. Schwartzwalter's duty to repay had been discharged. They never addressed that question. They never came head on and said, irrespective of whether she's entitled to these compensation payments, was her duty to repay already discharged? Wait a minute. I'm confused. There's a settlement agreement that contains at paragraph little b, I'm at the appendix. Three. Yeah, three little b. That accepts out certain claims from the settlement agreement and preserves certain claims. And the obligation that she has to repay under the promissory note is preserved there. Preserved. Right. So I don't know what you mean. What's her obligation that you're saying they should have said was it discharged? Her obligation to repay the promissory note. Right. The question is whether it was discharged by virtue of her getting long-term disability. If you take a look at, this is the argument from day one, and it's the reason that we brought this as a defense and not as a claim or a counterclaim. Well, how could she have signed a document and agreed that their claim under the promissory note continued? How could she have agreed to that? Well, it's not a question of what she agreed to. It's a question of what Merrill was willing to agree to in entering into the settlement agreement. Well, but you don't sign an agreement and say, oh, but I really didn't want that. They insisted on it, so I signed it. No, no. That's not the position we took. The position we took was, and Merrill, Mr. Portunato just alluded to that question. I'm still confused. Is there any issue as to whether that Merrill Lynch's claim under that promissory note against her is in existence? That that claim was preserved, and she agreed it was preserved, and it's there. She owes under the note. Yes, there is. There is? Here's the reason. There's a question about it. The mere fact that they could preserve their counterclaim against Ms. Schwartzwelder in no way affected whether she could defend against that. Oh, OK. All right. I see what you're saying. Yeah. I mean, so the answer is the fact that we couldn't get Merrill to throw in the towel back in December or November of 2009. I mean, that's effectively – I really think that's – you could phrase your question that way. But then she didn't preserve in that paragraph. She preserved a lot of claims. But she preserved her defense. Are you saying that – No, she didn't – well, let me say. In 3B, she preserved a lot of claims that she had, but she did not preserve her claim under the transition agreement. Because it's not a claim. It's not a claim, Your Honor. That's – if – and this is what I briefed to the Third Circuit initially. In my brief, I go into some detail about the difference between a claim and a defense. So you're saying but for – let's say the promissory note didn't exist. Mm-hmm. She has the transition agreement. Mm-hmm. You're saying that does not exist as a separate obligation? But here's the reason why. Answer the question. Does it exist as a separate obligation? Well, I can't answer that question, Your Honor, because – here's why. All of this was structured together. You can't – if you ask me if you can separate these two instruments, you can't. They do. They're separate by their language. Well – What brings them together? What brings them together is two things. What brings them together is on the face of it, they have exactly the same payments of $16,687.15 from November 2003 until November 2007. Mathematically, I defy anybody to tell me that there isn't mathematically the certainty that those two are one and the same. They have to be one and the same. Moreover – But that may have been for convenience's sake that, you know, oh, well, why don't we make these match each other and then we don't have to worry every month about making a payment. But – But to see the whole – but you asked the question before, which I thought was the critical question. What evidence, if any, did the panel take regarding the intent of the parties? How was this original arrangement made? Although, isn't it kind of first-year law school that you've got a statute of frauds and if you're going to intend something, you better put it in writing or the court really isn't going to hear about intent that's not in the writing? You mean way back in 2002? Yeah, when their first – when their agreements are first written. And the answer is – I mean, I practice law and you can say all you want about the intent. But if you don't have it in the document, are you even going to – is the court even allowed to hear it? Well, the answer is yes. The answer is yes. Here's why. How? Why? Well, because – What exception? I mean, we've got statute of frauds. We've got case law to the effect that if you have an agreement, it's got to be in writing. And the oral terms can't vary. The terms of the writing – in fact, the settlement agreement specifically says that. Well, but if you're asking me, Your Honor, whether the term forgivable loan or something along those lines had to be in both instruments, is that what you're suggesting? That they had to be connected? But there is no word forgivable in either of these instruments. That's correct. But that doesn't change their operation. That doesn't change their operation. All right. Well, if I could, Your Honor, but let me come back to something because the fundamental problem, I believe, with what the FINRA panel did was, yes, they addressed whether Ms. Schwartzwelder could bring a claim or a counterclaim, but they're suggesting that she bring a claim or a counterclaim for something that has zero monetary value. The compensation payments never went into Ms. Schwartzwelder's pocket. Never. They were never cash transactions. Never. That was – So you said compensation. Are you talking about transition? Yes. Okay. I didn't – I'm thinking transition is something different from her compensation. Why didn't the amounts match, though? Why didn't the amounts match? Well, they did match. No. You know, in terms of the accounting I've seen, there was less paid to – there was a different amount paid to Merrill Lynch from the $16,000-whatever dollars and 15 cents. Well, then the question becomes – because certainly, if you take a look at 582 of the employment agreement, that number matches exactly with the amount that's in the promissory note. And so now the question really becomes, Your Honor, in determining whether there is a one-to-one corresponds between the promissory note and the employment agreement, why didn't the FINRA panel take testimony on that? They made the leap – the FINRA panel made the leap in saying that because Merrill Lynch had a right to bring the counterclaim, that therefore, the matter was resolved. My position all along was, no, the matter is not resolved. The question remains whether she had a valid defense. And that defense being the question of whether, by virtue of the operation of the promissory note and the employment agreement, whether those payments canceled one another out. That was the position I took from the beginning. I just – so when we talk about – when we talk about what is the standard, Mr. Fortunato, of course, was saying, my gosh, if the – if the panel – this panel – if this panel vacates the FINRA arbitration ruling, my gosh, it's just open season on arbitration rulings. No, it's not, any more than it ever has been. The court has already – has always, always required panels, arbitrators and panels, to act rationally. And implicit in that, if you take a look at the decisions, implicit in that is following the relevant law and applying the facts. Well, that's – that's really a de novo standard. I mean, rationally is even – is rationally different from reasonably? Well – That's the way I look at it. Your Honor, all I can tell you, and I think it is a – it's a dilemma that all the courts have. I mean, the Supreme Court didn't do a whole lot of clarifying, really, when they – when they sat in Hall Street. I'm sorry. What's the dilemma? The dilemma is exactly what this standard means. What does the completely irrational standard mean? All right, to me. And I submit that – Absolutely lacking in support in the record. All right. But lacking in support – and support doesn't exist in isolation, in a vacuum. No. Support meaning, as far as I can tell from these decisions, support meaning factual support, rational factual support, and some connection to the law. I mean, surely I've – the opinions I've seen written by the Third Circuit, as well as the other circuits, make it clear that when a – when a panel, an arbitration panel, whether it's, for example, in the context of a collective bargaining agreement, and decisions will say, if the arbitrator simply reads something into the collective bargaining agreement that isn't there, and that under no reasonable standard anybody could read into it, that's irrational. So what I'm suggesting, if you take a look at the decision in Armstrong County Municipal Hospital – or Memorial Hospital, does willfully flouting the known law, does that constitute being completely irrational? Does it? Does that constitute – well, your mom – Being completely irrational. Oh, okay. Would not the panel have been reading something into the agreements that isn't there if it ruled in her favor? I don't believe so at all. As a matter of fact, the question is whether it's completely irrational, number one, for them to say there's actually – And I don't – I do think this is a closed case. I'm just trying to figure out the right way. Well, if I could, Your Honor, here's the way I think it can be resolved and really consistent with what this Court has done before. Remand and instruct the panel to determine – Which panel? The FINRA panel. Thank you. Instruct the FINRA panel to make a factual determination upon which it bases this conclusion. Is that what we do? Well, I'm sorry. I think the record's made in front of an arbitration panel. It is what it is. We don't do that to district courts. We take the record as we find it and we review it as it is. We don't tell them to go to court. Well, or you take it and vacate. Then you vacate. But, Your Honor, we had a discussion like this at the first oral argument. The question is this court would not issue a separate opinion, a new opinion, based on the record. What it would do is vacate the FINRA panel's ruling. And by vacating, that would remand it for another FINRA hearing. And then the question is, and what is it that – We would vacate and remand? We would reverse it? I'm not sure. Okay, good. What the district judge did in this case was to vacate and say, go recalculate. He did. Yes, he did. By concluding that the only conclusion that could be reached was that it was a forgivable loan situation. I guess he was reversing it. Right, he was reversing. He certainly wasn't saying, go back and do it all over again. Right, exactly. The arbitrators based their decision on the belief that her claims to repayment of the loan for Merrill Lynch were foreclosed by the settlement agreement. Well, that's what they said. And my position has been from day one, that's a completely irrational conclusion to reach because all they said was that Merrill, Merrill's counterclaim survived. It did not address the question of whether Ms. Schwartzwelder's loan was forgiven. They never addressed that. And, in fact, to the extent that they did address it, they got it fundamentally wrong by saying that she waived her defense. They said she waived her defense, and she didn't. And I want to emphasize one thing, if I could, because I think this has everything to do with whether this was a rational or irrational opinion, anything supported in any way by the FINRA panel. Ms. Schwartzwelder had the money. Ms. Schwartzwelder was in possession of the $850,000. She had the money. She already had the benefit of the bargain. So inherently, she didn't need to do a thing. All she needed to do was defend. I have the money. It's in my possession. I don't need to bring a claim or a counterclaim against you. All I need to do is show that by operation of law, by operation of my contract, I don't have to repay it. It's forgiven. So I want to emphasize that because, in effect, here we have a situation, whether it's a possessor of land, a possessor of any other thing of value. They have it. Somebody else wants it back. You don't have to bring a claim against that person, that plaintiff who wants it back. You have to defend. And fundamentally, that's how we argued this from the beginning. The other courts that have looked at this, by the way, and that's why I made quite a deal of discussing these various cases elsewhere that have looked at forgivable loans, so-called, have addressed it in much the same way. These transactions, if you will, these monthly compensation payments, were not cash transactions. They were accounting. And ultimately, the forgiveness was occurring over some period of months. The remaining forgiveness occurs upon the long-term disability. Okay. If I could. By the way, some questions about whether it was Meryl that had asked for the stay or whether it was Ms. Schwarzweiler. It was a back and forth, and it was mutual. At the end of the day, it was a mutual thing. Let me just, if I could, my time, I think, is up. But I will note this. I think, and again, why this FINRA panel ruling was so irrational. Any duty that Ms. Schwarzweiler had to repay the outstanding balance on the loan was extinguished once she became entitled to long-term disability. The FINRA panel itself said she became disabled effective May 4th of 2004. The FINRA panel also ruled. They deemed her to remain an employee for the next two years. That's what the FINRA panel ruled. But the FINRA panel didn't apply that ruling consistently. If the FINRA panel could have done one of two things, they could have said, as of May 4th of 2004, by operation of her employment agreement, the outstanding amount on the loan is satisfied or discharged. Secondly, if they're going to have a rule of law, a rule of the case, then they should have said, if she's still an employee for the next two years, then by operation of her employment agreement, monthly compensation payments are being made for the next two years. They didn't give her a penny of credit, nothing. So if you ask the question, how is this opinion from the FINRA panel irrational, it's irrational in my view not only on the basis of it failing to distinguish between a right to get some payment and a discharge of a duty, it's also irrational because what it does is, it doesn't even apply its own rule of the case. It doesn't even apply its own rule, which at the very least should have entitled Ms. Schwartzwell to a forgiveness of the next two years of payments. Thank you. Of course the arbitration panel addressed the promissory note issue. They asked her to repay it. They ordered her to repay it. And the argument that possession is nine-tenths of the law is a little sophistry here. That would mean any mortgage company or any lender who gave someone the money, the person would say, well, I don't have to pay it back because I possess the money. That's not the case here. And on that last point that Mr. Shivers raised, the panel said to him in the opinion or said to Ms. Schwartzwell in the opinion when he says they didn't even consistently apply their own language, you had an obligation or a duty to make a claim for those monthly transition compensation payments on the employment agreement. For whatever reason, after you settled the case before the Third Circuit argument on the ERISA claim, you entered into a release. You did not carve that claim out of the release. You then filed a Second Amendment complaint and a Third Amendment complaint where you did not say, I am entitled to that money on the employment agreement. And therefore, we believe that you have released that claim. You didn't bring it. And had you brought it, we deemed it to be released. The reality is that the only review of that, Mr. Shivers says, you know, there's a dilemma. There's no dilemma in the Third Circuit. In 2010, this Court decided the ARIO opinion, and you said, what it means is no support at all on the record. He further argued just now that the irrationality standard is somehow tied to the law, and I suppose that's a backdoor way of bringing in manifest disregard of the law. But you don't even need to bother yourself with that argument because Ms. The appendix, I mean the record in this case, is clear that when given the opportunity by the arbitration panel to make a legal argument, they chose not to give the panel anything. They then gave Judge Schwab 40 legal sites that they never gave to the arbitration panel that I believe he then mistakenly relied upon. Judge Schwab relied upon Rule 8. That's not a federal rule, so Procedure 8, that's not applicable to the arbitration panel. The law that he was reviewing wasn't applicable to the arbitration panel because they didn't get it. And the panel simply looked at what evidence they had in front of it, and they made a decision. And based on that record, the only review that either the district court or this court should do is whether that decision is so untethered from the submissions to the panel that it's therefore completely irrational. Let me just ask you one question then. In seeking a stay in Merrill Lynch's, I've looked at the record, Merrill Lynch's motion to stay the arbitration proceedings, Merrill Lynch represented if Schwarzwalder is deemed to be disabled, a determination that she seeks in her federal court action, then under a reading of her employment agreement most favorable to her, Schwarzwalder's loan with Merrill Lynch could be forgiven. Right. That was, I think, Your Honor, when you look at that language, you will see that that was our conveying, and Mr. Schivers just said it, there was a to and fro on that.  the claim. And what we decided was for economical reasons, for judicial economy, we'll let that issue go first to the court before we figure out what it means to the arbitration. And when you look into that, that wasn't the position we were staking out. We were saying that that is the position she is staking out. You were asking for a stay over their opposition. No, we asked. Over their opposition. Well, that's right because we knew the argument that they were going to take. So we thought let's run its course first in the ERISA claim because whatever that decision may be, no use arbitrating a case with a thinner panel when at the same time the benefits administrator and the district court are arm wrestling over what the application of ERISA would be. Because the outcome could have been that she was found not to have been disabled. And that would make the issue go away. And if she was found not to be disabled, then. The issue goes away. Well, the shoes could have been on the other foot. She could have still argued to our arbitration panel, well, that was the court's decision and the third party administrator's decision, but this arbitration panel can find that I'm disabled. And we could have argued the same thing, which we were prepared to argue to this panel, which is, well, the court found that she was disabled, but you get to make that separate determination under the employment agreement because the ERISA standard for disability under long-term disability plans could potentially be different from what this arbitration panel was trusted to decide. So we just said why do both at the same time if she's going to take that position. Either side, we have, either way, we may have an additional argument to make. Knowing that, though, Judge Van Aske, knowing that, she then signed the release before the Third Circuit argument and released the claims and then never reasserted them and didn't specifically carve them out. So knowing, even if she assumed that that's what our position was, going into the settlement agreement, she did not carve, for whatever reason, did not carve that out. And I think that at the end of the day when you're looking at just no justification at all in the record for that decision, the panel clearly considered, or the arbitration panel, Judge Slower, clearly considered all those issues and made a decision. And I don't believe it's irrational under the standards of the FAA. Thank you. Thank you. Thank you. Exactly.